## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

### IN ADMIRALTY

IN THE MATTER OF the Complaint
Of JAMES ROY TUCKER, JR., for
Exoneration from or limitation of liability,

      Petitioner

v.                                     Case No.: 3:20-cv-5943-TKW-MJF
                                         (consolidated with 28 other cases)

MARINA MANAGEMENT CORP.
and V&R INVESTMENTS, LTD.

      Claimants.

_____/

MARINA MANAGEMENT CORP.
and V&R INVESTMENTS, LTD.

      Plaintiffs,

v.                                       Case No.: 3:21-cv-2122-TKW-MJF

BILL ABRAMS, et al.,

      Defendants.

_____/

### AMENDED COMPLAINT OF MARINA MANAGEMENT CORP AND V&R INVESTMENTS, LTD

      Plaintiff, Marina Management Corp. ("Marina Management" or "MMC")

and V&R Investments, Ltd. ("V&R") (collectively, "Plaintiffs"), file this Amended

Complaint against the following defendants:  Bill Abrams and Marlinspike

1

Charters, James Iwan Alexander, Bryan Aylstock, Gary Bagaas, James Baird, Robert and Rikkata Beams, Glenn and Pamela Bousquet, Mark Breckenridge, the City of Pensacola, Robert and Esther Crongeyer, George William "Bill" Evans, Dana Foster, Guy and Pam Hall, Shawn Irie, Daniel Jaquish, Ronald "Ron" Jordan, Jeff Kantor and Blue Glacier Trust, Robert Kempen, Stan and Dana Kiefer, J.K. Florida, LLC d/b/a Lanier Sailing Academy, Stephen Leathers, Eric Lewis, John-Robert Lyons, John Maddaloni, Edmund Medley, David Nicholson, Michael Rehwinkel, Jose and Marlene Santos, Chris Smith, Christy Smith and Boat Place, LLC, Steve Spoerl and Southern Life Investments, LLC, Elizabeth and Steven Sutton, Lance Swanner, Richard C. and Deri L. Terry, Stephen Theis, Leo Ticheli, James Ward, David and Charlene Warren, Justin Phillip Warren, David and Carol Wedge, and Legendary Assets & Operations, LLC d/b/a Legendary Marine, stating as follows:

## JURISDICTION AND VENUE

1.     This is a case of admiralty and maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, the Supplemental Rules for Certain Admiralty and Maritime Claims and the Local Admiralty Rules of this Court.

2.     The Court has jurisdiction over this claim under 28 U.S.C. § 1333, because the incident described in this amended complaint occurred on and within

navigable waters and bears a substantial relationship to traditional maritime activity, as more fully alleged below, and it involves maritime contracts.

3.    At all times material to the events that form the basis for Plaintiffs' claims in this amended complaint, V&R Investments, Ltd. ("V&R") was the owner of the motor vessel *Valkyrie*.

4.    At all times material to the events that form the basis for Plaintiffs' claims in this amended complaint, Marina Management Corp. ("MMC") was the owner of the marina known as Palafox Pier and Yacht Harbor (the "Marina") located in Pensacola, Florida.

5.    At all times material to the events that form the basis for Plaintiffs' claims in this amended complaint, the vessels owned by the vessel owners identified in paragraphs 10 through 49 herein were moored in the Marina.

6.    At all times material to the events that form the basis for Plaintiffs' claims in this amended complaint, the City of Pensacola (the "City") leased the property in which the Marina is situated to MMC, and the City was contractually responsible to MMC for, *inter alia*, maintaining a breakwater that is situated just outside the Marina.

7.    The lease between MMC and the City was for the development, construction, and protection of the Marina, and the lease references, by description, maritime service and maritime transactions, and directly relates thereto.

8.     As to the claims against the vessel owners, venue is proper in this district because the events that form the basis for Plaintiffs' claims in this amended complaint involved vessels that were on and within navigable waters in Pensacola, Florida, which caused damage to the Marina, located in Pensacola, and the *Valkyrie*, also located in Pensacola at that time.

9.     As to the claims against the City, venue is proper in this district because the events that form the basis for Plaintiffs' claims in this amended complaint involve the Marina that is the subject of a lease between the City and MMC, they involve the breakwater for which the City is responsible for maintaining, both the Marina and the breakwater are situated on and within navigable waters in Pensacola, Florida, and the lease references, by description, maritime service and maritime transactions, and directly relates thereto.

## THE PARTIES

10.     Bill Abrams and/or Marlinspike Charters were the owners of the *Boatox*, a 60-foot Azimut, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is

4

attached as Exhibit "3" to the Complaint filed on November 10, 2021 [*see* Doc. 1-4].[1]

11.    James Iwan Alexander was the owner of *Magnolia*, a 33-foot Beneteau, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "4" to the Complaint filed on November 10, 2021 [*see* Doc. 1-5].

12.    Bryan Aylstock was the owner of *Legal Limits*, a 34-foot Boston Whaler, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "5" to the Complaint filed on November 10, 2021 [*see* Doc. 1-6].

13.    Gary Bagaas was the owner of the *Dawnson Marie*, a 42-foot Sea Ray, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "6" to the Complaint filed on November 10, 2021 [*see* Doc. 1-7].

---

[1] Unless otherwise stated, all references to Docket numbers herein are references to ECF Docket numbers in Case No. 3:21-cv-02122-TKW-HTC, which was consolidated by Order dated November 30, 2021 in the consolidated Tucker case, Case No. 3:20-cv-05943-TKW-MJF [*see* Tucker Doc. 82].

14.     James Baird was the owner of *One More Day*, a 48-foot Sea Ray, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "7" to the Complaint filed on November 10, 2021 [*see* Doc. 1-8].

15.     Robert and Rikkata Beams were the owners of *Splendid III*, a 50-foot Chris Craft, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "8" to the Complaint filed on November 10, 2021 [*see* Doc. 1-9].

16.     Glenn and Pamela Bousquet were the owners of *Bousquet Belle*, a 59-foot Bluewater, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "9" to the Complaint filed on November 10, 2021 [*see* Doc. 1-10].

17.     Mark Breckenridge was the owner of *Sin or Swim*, a 50-foot Sea Ray, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "10" to the Complaint filed on November 10, 2021 [*see* Doc. 1-11].

18.    Robert and Esther Crongeyer were the owners of the *Esther Jane*, a 49-foot Hyundai, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "11" to the Complaint filed on November 10, 2021 [*see* Doc. 1-12].

19.    George William "Bill" Evans was the owner of the *Bailiwick*, a 45-foot Californian, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "12" to the Complaint filed on November 10, 2021 [*see* Doc. 1-13].

20.    Dana Foster was the owner of *Born 2 Run*, a 63-foot Hatteras, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "13" to the Complaint filed on November 10, 2021 [*see* Doc. 1-14].

21.    Guy and Pam Hall were the owners of *Dansanter*, a 45-foot Steel Cutter, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "14" to the Complaint filed on November 10, 2021 [*see* Doc. 1-15].

22.     Shawn Irie was the owner of *My Dear Frank-Leigh*, a 42-foot Cruisers, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "15" to the Complaint filed on November 10, 2021 [*see* Doc. 1-16].

23.     Daniel Jaquish was the owner of *Lucy III*, a 36-foot Silverton, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "16" to the Complaint filed on November 10, 2021 [*see* Doc. 1-17].

24.     Ronald "Ron" Jordan was the owner of *Sunset Raider*, a 37-foot Hunter, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "17" to the Complaint filed on November 10, 2021 [*see* Doc. 1-18].

25.     Jeff Kantor and/or Blue Glacier Trust were the owners of *Alaskan Escape*, a 40-foot Tiara, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is

attached as Exhibit "18" to the Complaint filed on November 10, 2021 [*see* Doc. 1-19].

26.    Robert Kempen was the owner of *Stock & Trade*, a 50-foot Hatteras, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "19" to the Complaint filed on November 10, 2021 [*see* Doc. 1-20].

27.    Stan and Dana Kiefer were the owners of *Hanging with Hilda*, a 36-foot Cruiser, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "20" to the Complaint filed on November 10, 2021 [*see* Doc. 1-21].

28.    J.K. Florida, LLC d/b/a Lanier Sailing Academy was the owner of multiple vessels docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Those vessels include a houseboat, five 22-foot Capris, and two 25-foot Catalinas.  Said vessels were docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "21" to the Complaint filed on November 10, 2021 [*see* Doc. 1-22].

29.    Stephen Leathers was the owner of *Cattywampus*, a 42-foot Manta Catamaran, which was docked at the Marina on September 16, 2020 when

Hurricane Sally struck the area. Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "22" to the Complaint filed on November 10, 2021 [*see* Doc. 1-23].

30.    Eric Lewis was the owner of *Elisea*, a 60-foot Princess, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area. Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "23" to the Complaint filed on November 10, 2021 [*see* Doc. 1-24].

31.    John-Robert Lyons and Maya Jurasz were the owners of *Prana*, a 35-foot Beneteau, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area. Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "24" to the Complaint filed on November 10, 2021 [*see* Doc. 1-25].

32.    John Maddaloni was the owner of *Gawnagain*, a 45-foot Express Bridge, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area. Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "25" to the Complaint filed on November 10, 2021 [*see* Doc. 1-26].

33.    Edmund Medley was the owner of *Tiger Lillie*, a 34-foot Gemini, which was docked at the Marina on September 16, 2020 when Hurricane Sally

struck the area. Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "26" to the Complaint filed on November 10, 2021 [*see* Doc. 1-27].

34.    David Nicholson was the owner of *Starbuck*, a 45-foot Cabo, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area. Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "27" to the Complaint filed on November 10, 2021 [*see* Doc. 1-28].

35.    Michael Rehwinkel was the owner of *Sweet P*, a 34-foot Boston Whaler, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area. Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "29" to the Complaint filed on November 10, 2021 [*see* Doc. 1-30].

36.    Jose and Marlene Santos were the owners of *All Saints II*, a 30-foot Jeanneau, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area. Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "30" to the Complaint filed on November 10, 2021 [*see* Doc. 1-31].

37.    Chris Smith was the owner of *Maverick*, a 50-foot Monohull Sail, which was docked at the Marina on September 16, 2020 when Hurricane Sally

struck the area.  Said vessel was docked at the Marina pursuant to a Moorage

Sublease Agreement, a true and accurate copy of which is attached as Exhibit "31"

to the Complaint filed on November 10, 2021 [*see* Doc. 1-32].

38.    Christy Smith (Boat Place, LLC) was the owner of *Pharaoh of the
Sea*, a 50-foot Aicon, which was docked at the Marina on September 16, 2020

when Hurricane Sally struck the area.  Said vessel was docked at the Marina

pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is

attached as Exhibit "32" to the Complaint filed on November 10, 2021 [*see* Doc. 1-
33].

39.    Steve Spoerl and/or Southern Life Investments, LLC were the owners

of *All In*, a 56-foot Sea Ray, which was docked at the Marina on September 16,

2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina

pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is

attached as Exhibit "33" to the Complaint filed on November 10, 2021 [*see* Doc. 1-
34].

40.    Elizabeth and Steven Sutton were the owners of *Oh Yeah*, a 38-foot

Carver, which was docked at the Marina on September 16, 2020 when Hurricane

Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage

Sublease Agreement, a true and accurate copy of which is attached as Exhibit "34"

to the Complaint filed on November 10, 2021 [*see* Doc. 1-35].

41.    Lance Swanner was the owner of *Mas Tiempo*, a 35-foot Island Packet, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "35" to the Complaint filed on November 10, 2021 [*see* Doc. 1-36].

42.    Richard C. and Deri L. Terry were the owners of *Ruff Seas*, a 47.9-foot Hi-Star Sundeck, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "36" to the Complaint filed on November 10, 2021 [*see* Doc. 1-37].

43.    Stephen Theis was the owner of *Main Squeeze*, a 41-foot Maship Trawler, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "37" to the Complaint filed on November 10, 2021 [*see* Doc. 1-38].

44.    Leo Ticheli was the owner of *Valentine*, a 40-foot Odyssey, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease

Agreement, a true and accurate copy of which is attached as Exhibit "38" to the Complaint filed on November 10, 2021 [*see* Doc. 1-39].

45.    James Ward was the owner of *Classea*, a 41-foot Defever, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area. Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "39" to the Complaint filed on November 10, 2021 [*see* Doc. 1-40].

46.    David and Charlene Warren were the owners of *Charla's Legacy*, a 36-foot Legacy, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "40" to the Complaint filed on November 10, 2021 [*see* Doc. 1-41].

47.    Justin Phillip Warren was the owner of *Plaintiff's Rest*, a 36-foot Niagria Hinerhoell, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "41" to the Complaint filed on November 10, 2021 [*see* Doc. 1-42].

48.    David and Carol Wedge were the owners of *Adventuress*, a 42-foot Bertram, which was docked at the Marina on September 16, 2020 when Hurricane Sally struck the area.  Said vessel was docked at the Marina pursuant to a Moorage

14

Sublease Agreement, a true and accurate copy of which is attached as Exhibit "42" to the Complaint filed on November 10, 2021 [*see* Doc. 1-43].

49.     Legendary Assets & Operations, LLC d/b/a Legendary Marine leased a slip at the Marina to house demo boats at various times through the term of the lease. On September 16, 2020, when Hurricane Sally struck the area, Legendary Assets & Operations, LLC d/b/a Legendary Marine had a boat docked in the Marina.  Said vessel was docked at the Marina pursuant to a Moorage Sublease Agreement, a true and accurate copy of which is attached as Exhibit "43" to the Complaint filed on November 10, 2021 [*see* Doc. 1-44].

## FORMATION AND DEVELOPMENT OF HURRICANE SALLY f/k/a TROPICAL STORM SALLY f/k/a TROPICAL STORM NINETEEN

50.     Tropical Depression Nineteen, the tropical depression that would become Tropical Storm Sally, and that would later strengthen into Hurricane Sally, formed in the afternoon of Friday, September 11, 2020.

51.     The National Hurricane Center issued Advisory 1 at 4:00 Central Time on the afternoon of Friday, September 11, 2020, along with a projected path of the storm.  A true and accurate copy of Advisory 1, the projected path issued in conjunction with Advisory 1, and later Advisories and projected paths of the storm issued by the National Hurricane Center, are attached as Exhibit "1" to the Complaint filed on November 10, 2021 [*see* Doc. 1-2].  Larger images of the

projected paths of the storm issued by the National Hurricane Center are attached

as Exhibit "2" to the Complaint filed on November 10, 2021 [*see* Doc. 1-3].

52.     On Saturday, September 12, 2020, Tropical Depression Nineteen

gained strength and was re-categorized as a tropical storm, named Tropical Storm

Sally.  *See* Advisory 5 from the National Hurricane Center [Doc. 1-2].

53.     On Monday, September 14, 2020, Tropical Storm Sally, having

further gained strength, became Hurricane Sally.  *See* Advisory 13 from the

National Hurricane Center [Doc. 1-2], issued at 11:30 a.m. Central Time.

54.     Hurricane Sally continued to head in a generally

northward/northwesterly direction towards the Gulf Coast, as more particularly

shown in Exhibits "1" and "2" to the Complaint filed on November 10, 2021 [*see*

Docs. 1-2 and 1-3].

55.     The eye of Hurricane Sally made landfall in or about Gulf Shores,

Alabama on the morning of September 16, 2020, as a Category 2 hurricane.

56.     The Marina sustained serious damage during the hurricane.

57.     V&R's vessel, the *Valkyrie*, sustained damage during the hurricane

from the Tucker vessel and the Abrams/ Marlinspike Charters vessel.

16

## DUTIES OF THE VESSEL OWNERS UNDER THE MOORAGE SUBLEASE AGREEMENTS

58.     The vessel owners listed in paragraphs 10 through 49 had a Moorage

Sublease Agreement ("Moorage Contract" or "Contract") with MMC, as alleged

above.

59.     The terms of those Moorage Contracts were identical in all material

respects (the primary differences being in the price and the start and end dates).

Reference herein to a "Moorage Contract" or a "Contract" refers to each respective

vessel owner's Moorage Contract, as referenced above.

60.     As shown herein, tropical storm watches and warnings were issued for

the Pensacola area well prior to Hurricane Sally's landfall.

61.     It was well-known days in advance of landfall that the Pensacola area

would experience effects from the storm.  This was known well before hurricane

watches and warnings were issued for the Pensacola area on Monday afternoon at

4:00 p.m.

62.     Multiple storm warnings had been issued to the public, well in

advance of the storm, that the storm would cause rough seas and storm surge along

the Gulf Coast.

63.     Multiple warnings were issued to the public, well in advance of the

storm, that the storm would cause rough seas and storm surge along the Gulf

Coast.  The Gulf Coast was on notice of such conditions well before tropical storm

17

or hurricane warnings were issued for the area in which the Marina is located, and well before any hurricane watches were issued for the area in which the Marina is located. That advance notice gave vessel owners several days prior to the storm's landfall to remove their vessels from the Marina (or to otherwise take steps to ensure they maintained control over their Vessel during the approach and landfall of the storm and to do so in a manner that would not damage others' property) and to do so with no danger or risk of harm to vessel owners, including Plaintiffs.

64.    Despite those warnings, the vessel owners left their vessels tied to the piers and docks of the Marina as the storm made landfall.

65.    The vessels' presence in the Marina during the storm resulted in or were a substantial factor in significant damage and destruction to the Marina (including its piers and docks) and to other vessels in or near the Marina, including the vessel owned by V&R that was located nearby the Marina.

66.    By contract (the Moorage Contract), the vessel owners had obligated themselves to take numerous precautionary measures in anticipation of storms such as Hurricane Sally, including, most importantly, the removal of their vessels from the Marina in advance of an approaching storm. *See* Contract ¶ 26 and Exhibit "B" thereto.

## ACKNOWLEDGEMENTS AND OBLIGATIONS OF THE VESSEL OWNERS UNDER THE MOORAGE CONTRACTS

67.   Each vessel owner expressly acknowledged and contractually agreed that:

(a)   the waters of the Marina would be unsafe for all boats from the effects of a tropical storm or hurricane.  Contract ¶ 26.A.1.

(b)   a boat moored to the Marina piers would cause the piers to be destroyed (as well as the vessel owner's boat and other boats) while experiencing the effects of a tropical storm or hurricane.  Contract ¶ 26.A.2.

(c)   studies have established that vessels and boats moored in or near marina waters or wet slips are more likely to suffer storm-related damage and are more likely to cause damage to other boats, marina property, and the environment, than boats that are removed from the marina waters and wet slips.  Contract ¶ 26.A.3.

(d)   if the vessel remained in the Marina slip during any named storm, then it was natural, expected, and assumed that, notwithstanding all efforts to secure the vessel, its presence in the Marina would cause serious and substantial damage to the Marina property.  Contract ¶ 26.A.9.

(e)   the National Weather Service and news media can and does provide generous advance notice of tropical storms and hurricanes sufficient to relocate or remove vessel owner's vessel to minimize or prevent damage

19

to the vessels, the Marina, and the environment.  *See* Contract ¶ 26.A.4; *see also* Exhibit "B" to Contract.

(f)    upon ***either*** (1) receiving notice from MMC that it has activated its Tropical Storm and Hurricane Evacuation Plan, ***or*** (2) news media publicity that a tropical storm or hurricane watch is issued within 100 miles of the Marina, the vessel owner would (so long as doing so would not imperil life or limb) remove the vessel from the Marina as set out in paragraph 26.A. of the Contract.  Exhibit "B" to Contract.

(g)    "in any event," the vessel owner "covenant[ed] and agree[d] to keep itself informed about impending tropical storms and hurricanes."  *See* Contract ¶ 26.A.6.

(h)    the effects of a tropical storm or hurricane on the waters of the Marina would be greatly exacerbated and compounded if the vessel was left at the Marina during such a storm.  Contract ¶ 26.A.10.

(i)    if the vessel remained in the slip during any named storm, the vessel owner would be liable for any and all damages to MMC's property caused by the vessel, including, but not limited to, damage caused by the vessel from the effects of a tropical storm or hurricane.  Contract ¶ 26.A.9.

(j)    there would be an irrefutable conclusive presumption that any boat or vessel remaining in the Marina basin, slip, or other Marina facilities

20

during a tropical storm or hurricane shall be deemed to have caused liquidated damages relating to property damage in the amount of $25,000, which amount would be due and payable upon demand if the vessel owner elected to keep the vessel in the slip, Marina basin, or other Marina facilities during a tropical storm or hurricane.  Contract ¶¶ 26.A.9 and 26.A.10.

     (k)    in the event of any action by or against the vessel owner arising from loss or injury to MMC from the effects of a tropical storm or hurricane, the vessel owner would not raise the Act of God defense, and that the vessel owner expressly waived that defense.  Contract ¶ 26.A.10.

68.    The parties' agreement as to those terms was a bargained-for agreement that contractually allocated risks and responsibility for damages to the Marina that would result from a named storm—in this case, Hurricane Sally.  And the parties agreed that "if Tenant [the vessel owners] elects to keep the boat in the slip, Marina basin, or other Marina facilities during a tropical storm or hurricane," the vessel owners would be responsible for the damages to the Marina.  *See* Contract ¶ 26.A.9.

69.    The contractual duty to evacuate the Marina was triggered before a tropical storm watch or warning was issued for Pensacola.

21

70.    The contract states in relevant part that "***in any event***, Tenant covenants and agrees to keep itself informed about impending tropical storms and hurricanes."  Contract ¶ 26.A.6 (emphasis added).

71.    The vessel owners had an independent duty to be aware of the approach of hurricane and tropical storms, including following storm advisories and media reports, and to take prompt action to remove their vessels before it became unsafe to do so.

72.    The obligation under the Contract was to prepare for a storm *before* the effects of the storm made it dangerous to evacuate the vessels.  Vessel owners acknowledged they could do so given the capabilities of modern weather forecasting and the widespread dissemination of such weather forecasts.  *See* Contract ¶¶ 26.A.4 and A.6.

## THE STORM'S PROGRESSION AS IT RELATES TO THE TERMS OF THE MOORAGE CONTRACTS AND THE VESSEL OWNERS' DUTY TO EVACUATE

73.    Prior to Tropical Depression Nineteen entering the Gulf of Mexico, on Friday, September 11, 2020, at 10:00 p.m. Central Time, the National Hurricane Center (a department of the National Weather Service) issued a tropical storm watch for an area on the Gulf Coast that is within 100 miles of the Marina.  *See* Advisory 2 [Docs. 1-2 and 1-3].  Notices of this weather advisory were publicized by the National Weather Service and the news media.

74.    The issuance of that tropical storm watch was for an area that was within 100 miles of the Marina.

75.    Under the vessel owners' contracts, the issuance of that tropical storm watch on Friday, September 11, 2020 at 10:00 p.m. Central Time triggered the contractual duty of the vessel owners to evacuate the Marina.

76.    Just following the entry of Tropical Storm Sally into the Gulf of Mexico after it passed over the southern tip of Florida (in the Miami area), on Saturday, September 12, 2020, at 4:00 p.m. Central Time, the National Hurricane Center issued a tropical storm watch for the area in which the Marina is located (downtown Pensacola).  At that time, the National Weather Center also issued a hurricane watch extending westward from the Florida/Alabama line into Louisiana. *See* Advisory 5 [Docs. 1-2 and 1-3].  Notices of this weather advisory were publicized by the National Weather Service and the news media.

77.    The area in which the Marina is located remained under a tropical storm watch until Sunday, September 13, 2020, at 4:00 a.m. Central Time, when the threat to the Marina area was elevated to a tropical storm warning.  *See* Advisory 7 [Docs. 1-2 and 1-3].  Notices of this weather advisory were publicized by the National Weather Service and the news media.

78.    The area in which the Marina is located remained under a tropical storm warning until Monday, September 14, 2020, at 4:00 p.m. Central Time,

when the threat to the Marina area was elevated to a hurricane warning.  *See* Advisory 14 [Docs. 1-2 and 1-3].  Notices of this weather advisory were publicized by the National Weather Service and the news media.

79.    Prior to Advisory 14 (issued on Monday, September 14, 2020, at 4:00 p.m. Central Time), the area in which the Marina is located had not been under either a hurricane watch or warning—only tropical storm watches and warnings.

80.    The vessel owners agreed that they would independently keep themselves informed about impending tropical storms and hurricanes.  Contract ¶ 26.A.6 ("… but in any event, Tenant covenants and agrees to keep itself informed about impending tropical storms and hurricanes.").

81.    The vessel owners had further contractually agreed that upon either (1) receiving notice from MMC that it has activated its Tropical Storm and Hurricane Evacuation Plan, *or (2) news media publicity that a tropical storm or hurricane watch is issued within 100 miles of the Marina*, the vessel owners would (so long as doing so would not imperil life or limb) *remove the vessel from the Marina*.  *See* Exhibit "B" to Moorage Contract.

82.    News media publicity that a tropical storm watch was issued within 100 miles of the Marina occurred by Friday evening, September 11, 2020 at 10:00 p.m.  From that time until a hurricane warning was issued for the Marina on the afternoon of Monday, September 14, the seas and winds in and around the Marina

24

were not rough or dangerous and would not imperil life or limb if a person were to take their vessel from the Marina to another location.

83.     The vessel owners further agreed that if their vessel remained in the slip during any named storm, the vessel owners would be liable for any and all damages to MMC's property caused by their vessel, including, but not limited to, damage caused by the vessel from the effects of a tropical storm or hurricane. Contract ¶ 26.A.9.

84.     The vessel owners further agreed to an irrefutable conclusive presumption that any boat or vessel remaining in the Marina basin, slip, or other Marina facilities during a tropical storm or hurricane shall be deemed to have caused liquidated damages relating to property damage in the amount of $25,000, which amount would be due and payable upon demand if the vessel owners elected to keep the vessel in the slip, Marina basin, or other Marina facilities during a tropical storm or hurricane.  Contract ¶ 26.A.9.

85.     The parties also agreed that "if Tenant [the vessel owners] elects to keep the boat in the slip, Marina basin, or other Marina facilities during a tropical storm or hurricane," the vessel owners would be responsible for the damages to the Marina.  *See* Contract ¶ 26.A.9.  This responsibility for damages is triggered by an election "to keep the boat in the slip … during a tropical storm or hurricane."

86.    In summary, the vessel owners were required to move their vessels from the Marina upon issuance of a tropical storm watch within an area 100 miles away from the Marina, and that provision was triggered by the issuance of the tropical storm watch on Friday evening (September 11, 2020) at 10:00 p.m.  *See* Exhibit "B" to Contract.

87.    The vessel owners identified in paragraphs 10 through 49 failed to move their vessels from the Marina upon issuance of a tropical storm watch within an area 100 miles away from the Marina, and instead left them in the Marina up to and including the time in which Hurricane Sally made landfall.

## THE BREAKWATER FOR THE MARINA

88.    The Marina is—or is supposed to be—protected by a breakwater maintained by the City.

89.    The property in which the Marina is located is leased from the City of Pensacola (the "City") pursuant to the Lease that is attached as Exhibit "44" (the "Lease") to the Complaint filed on November 10, 2021 [*see* Doc. 1-45].[2]

_____

[2] The Lease between the City of Pensacola and Marina Management Corp. has been amended since its original recording in 1997.  In an effort to not encumber the Court's record, only the original Lease, and its original exhibits, were filed as Exhibit "44."

90.    The pith of the Lease was the development and construction of a marina by the City's lessor (MMC) that would be protected by a breakwater built by the City.

91.    Under the Lease, MMC was responsible for the construction of a marina on the leased property, the construction of which is described in the Lease as the "Project Improvements."  *See* Lease Article VI and VII (pg. 5-6).

92.    Consideration for the Lease included lease fees, and the construction and maintenance, by the City, of the breakwater.

93.    The Lease required the City to construct the breakwater protecting the marina *before* MMC spent millions of dollars to construct the marina.

94.    Under the Lease, the marina (the Project Improvements by MMC) was to consist of approximately 120 (not to exceed 122) boat slips.  *See* Lease Article VI and VII (pg. 5-6).

95.    Under the Lease, the City was responsible for "Lessor Improvements," most notably, the construction of a breakwater that is situated just outside the Marina.  *See* Lease Article VII (pg. 5-6).  The intended purpose of the breakwater was to protect the tenant-built marina.

96.    MMC constructed the Marina as required by the Lease.

97.    As noted above, the Marina was heavily damaged and substantially destroyed during Hurricane Sally.

27

98.     Other vessel owners that kept their vessels in the Marina during the storm have alleged that the breakwater does not provide adequate protection for the Marina.

99.     The City, by its own admission, failed to construct a breakwater that would adequately protect the marina.

100.    Upon preliminary analysis, and assuming the vessel owners alleging an inadequate breakwater are correct in their assertions, the design and/or construction of the breakwater was defective and deficient in that the breakwater does not go all the way to the floor of the bay—it stops short by several feet of the floor of the bay.

101.    Plaintiffs are not architects, engineers, or breakwater contractors; however, to a layperson the vessel owners' allegations appear (facially) to have some merit, and thus the City is named in this lawsuit as a potentially responsible party.

## **DAMAGES TO PROPERTY AND OTHER DAMAGES**

102.    The vessel owners' failure to remove their vessels from the Marina in advance of the storm caused damage to MMC's real property (the docks and piers at the Marina).

103.   The vessel owners' failure to remove their vessels from the Marina in advance of the storm constituted both negligence and a breach of the contract by the vessel owners.

104.   The vessel owners operated, maintained, and/or moored their vessels in a generally negligent, careless, and reckless manner, without due regard for the safety and property of others, and failed to maintain control over their vessels, by keeping their vessels moored, unattended, in the Marina despite the approaching storm, and doing so despite the vessel owners' recognition and acknowledgement of the inherent dangers and risks thereof.

105.   The vessels' presence in the Marina during the storm resulted in damage to the Marina and to other vessels in the Marina.

106.   In addition to the property damage described above, MMC also suffered incidental and consequential damages that include, without limitation, business interruption damages, including loss of revenue that otherwise would have been collected from annual leases, transient slip rentals and rentals to houseboats, fishing tournament fees, and from fuel dock and ship store sales.

107.   V&R also suffered damages when Tucker's vessel and Abrams' vessel became adrift during the storm, allided with the Valkyrie, causing property damage thereto.

108.   MMC seeks recovery against the vessel owners for all damages incurred, or that will be incurred, by MMC in relation to the events described herein.

109.   MMC did not cause or contribute to the damages incurred, or that will be incurred, by MMC in relation to the events described herein.

110.   V&R seeks recovery against the vessel owners for all damages incurred, or that will be incurred, by V&R in relation to the events described herein.

111.   V&R did not cause or contribute to the damages incurred, or that will be incurred, by V&R in relation to the events described herein.

112.   All conditions precedent to the filing of these claims have been met, have occurred, or have been waived.

113.   MMC is entitled to recover all expenses, attorneys' fees, and costs in connection with this dispute with the vessel owners, *see* Contract ¶ 21, as more particularly described therein.

114.   MMC is entitled to recover all expenses, attorneys' fees, and costs in connection with this dispute with the City, *see* Lease Article XXII [Doc. 1-45], as more particularly described therein.

115.   MMC has retained the services of the undersigned attorneys and is obligated to pay them a reasonable fee.

116.   V&R has retained the services of the undersigned attorneys and is obligated to pay them a reasonable fee.

## COUNT I: BREACH OF CONTRACT
### (MMC v. Vessel Owners)

117.   This is an action against the vessel owners identified in paragraphs 10 through 49 for damages, based on breach of contract.

118.   MMC re-alleges paragraphs 1 through 116 and incorporates them herein by reference.

119.   The contracts attached as Exhibits "3" through "43" to the Complaint filed on November 10, 2021 [*see* Docs. 1-4 through 1-44] are valid and binding contracts between each respective vessel owner and MMC.

120.   By executing the contract, each vessel owner became bound to the terms and conditions of the contract.

121.   The vessel owners agreed, in the contract, to remove their vessels from the Marina prior to the issuance of a tropical storm or hurricane watch or warning, and further agreed that if the vessel owners failed to do so, the vessel owners would be responsible for damages, including incidental and consequential damages, suffered by MMC.

122.   As described more particularly above, no less than four days before Hurricane Sally made landfall on the Gulf Coast, it was well-known that a tropical storm had formed and was approaching the Gulf Coast.  It was thus well-known,

no less than four days before the storm impacted the area, that the Gulf Coast was being threatened by, at a minimum, the effects of a tropical storm.

123.   Tropical storm and hurricane watches and warnings were issued for the area prior to Hurricane Sally's landfall.

124.   Well before tropical storm and hurricane watches and warnings were issued for the Pensacola area, it was well-known that the Pensacola area would experience effects from the storm.

125.   The vessel owners failed to remove their vessels from the Marina.

126.   The vessel owners breached their contract as a result of their failure to remove their vessels from the Marina.

127.   MMC has been damaged as a result of the vessel owners' breach of contract.

WHEREFORE, MMC demands judgment against the vessel owners for damages, to include, without limitation, consequential damages, prejudgment interest, expenses, attorneys' fees, and court costs, and for such further relief as this Court deems just and appropriate.

## COUNT II: NEGLIGENCE
### (MMC v. Vessel Owners)

128.   This is an action against the vessel owners identified in paragraphs 10 through 49 for damages for damages, based on negligence, arising under the general maritime law of the United States and the laws of the state of Florida.

129.   MMC re-alleges paragraphs 1 through 116 and incorporates them herein by reference.

130.   As described more particularly above, no less than four days before Hurricane Sally made landfall on the Gulf Coast, it was well-known that a tropical storm had formed and was approaching the Gulf Coast.  It was thus well-known, no less than four days before the storm impacted the area, that the Gulf Coast was being threatened by, at a minimum, the effects of a tropical storm.

131.   Tropical storm and hurricane watches and warnings were issued for the area prior to Hurricane Sally's landfall.

132.   Well before tropical storm and hurricane watches and warnings were issued for the Pensacola area, it was well-known that the Pensacola area would experience effects from the storm.

133.   The vessel owners had a duty to exercise reasonable care under the circumstances.

134.   The vessel owners failed to remove their vessels from the Marina.

135.   It was natural, expected, and/or reasonably foreseeable that if the vessels were left unattended in a marina wet slip during a time in which the marina was experiencing effects from tropical storms or hurricanes, control over the vessels would be compromised or lost, and the vessels would be cast about in the

slip by wind, waves, and storm surge, causing damage to the docks and to the property of others, including other vessels.

136.   The vessel owners operated, maintained, and/or moored their vessels in a generally negligent, careless, and reckless manner, without due regard for the safety and property of others, and failed to maintain control over their vessels, by keeping their vessels moored, unattended, in the Marina despite the approaching storm, and doing so despite the vessel owners' recognition and acknowledgement of the inherent dangers and risks thereof, and their failure to maintain control over their vessels.

137.   The vessel owners breached their duty to exercise reasonable care under the circumstances, as set forth more fully above, including, without limitation, by their failure to remove their vessels from the Marina, as the vessel owners with contracts acknowledged in their Contracts would be the reasonable course of action under the circumstances of an approaching storm, and by their failure to maintain control over their vessels.

138.   The vessel owners' negligence was a substantial factor in and/or the proximate cause of MMC's damages.

WHEREFORE, MMC demands judgment against the vessel owners for damages, to include, without limitation, consequential damages, prejudgment interest, expenses, attorneys' fees, and court costs, and for such further relief as

this Court deems just and appropriate.

**COUNT III: NEGLIGENCE**
**(V&R v. Abrams and Marlinspike Charters)**

139.   This is an action against Abrams and Marlinspike Charters for

damages, based on negligence, arising under the general maritime law of the

United States and the laws of the state of Florida.

140.   V&R re-alleges paragraphs 1 through 116 and incorporates them

herein by reference.

141.   As described more particularly above, no less than four days before

Hurricane Sally made landfall on the Gulf Coast, it was well-known that a tropical

storm had formed and was approaching the Gulf Coast. It was thus well-known, no

less than four days before the storm impacted the area, that the Gulf Coast was

being threatened by, at a minimum, the effects of a tropical storm.

142.   Tropical storm and hurricane watches and warnings were issued for

the area prior to Hurricane Sally's landfall.

143.   Well before tropical storm and hurricane watches and warnings were

issued for the Pensacola area, it was well-known that the Pensacola area would

experience effects from the storm.

144.   It was natural, expected, and/or reasonably foreseeable that if the

vessels were left unattended in a marina wet slip during a time in which the marina

was experiencing effects from tropical storms or hurricanes, control over the

35

vessels would be compromised or lost, and the vessels would be cast about in the slip by wind, waves, and storm surge, causing damage to the docks and to the property of others, including other vessels.

145.   Abrams and Marlinspike Charters had a duty to exercise reasonable care under the circumstances.

146.   Abrams and Marlinspike Charters, the owner of the vessel, had a duty to maintain control over the vessel.

147.   Abrams and Marlinspike Charters failed to remove the vessel from the Marina.

148.   Abrams and Marlinspike Charters failed to take sufficient steps to ensure that they maintained control over his vessel during the approach and landfall of the storm.

149.   Abrams and Marlinspike Charters operated, maintained, and/or moored his vessel in a generally negligent, careless, and reckless manner, without due regard for the safety and property of others, and failed to maintain control over the vessel, by keeping the vessel moored, unattended, in the Marina despite the approaching storm, and doing so despite their recognition and acknowledgement of the inherent dangers and risks thereof.

150.   Abrams and Marlinspike Charters breached the duty to exercise reasonable care under the circumstances, as set forth more fully above, including,

36

without limitation, by the failure to remove the vessel from the Marina, as acknowledged in the Contract would be the reasonable course of action under the circumstances of an approaching storm, and by failing to maintain control over the vessel.

151. As described more fully herein, Abrams' and Marlinspike Charters' vessel became adrift during the storm and allided with *Valkyrie*, causing damage to *Valkyrie*.

152. As described more fully herein, V&R suffered damages caused by Abrams' and Marlinspike Charters' negligence in relation to the operation and moorage of the vessel.

153. Abrams' and Marlinspike Charters' negligence was the proximate cause of V&R's damages.

WHEREFORE, V&R demands judgment against Abrams and Marlinspike Charters for damages, to include, without limitation, consequential damages, prejudgment interest, expenses, and court costs, and for such further relief as this Court deems just and appropriate.

## COUNT IV: BREACH OF CONTRACT
### (MMC v. City)

154. This is an action against the City for damages, based on breach of contract.

155.   MMC re-alleges paragraphs 1 through 116 and incorporates them herein by reference.

156.   The Lease [Doc. 1-45] is a valid and binding contract between MMC and the City.

157.   By executing the Lease, the City became bound to the terms and conditions of the Contract.

158.   The City agreed, in the Lease, to construct a breakwater, and was to do so before MMC spent millions of dollars to build docks and piers that depended on that breakwater for protection.

159.   The City failed to construct a breakwater properly designed to serve its intended function.

160.   The City's failure to construct a properly designed breakwater was a breach of the Lease.

161.   Said breach was a substantial factor in the damages caused to the Marina and to MMC.

162.   The City's failure to (upon information and belief) construct an adequate breakwater was a substantial factor in the damages caused to the Marina and to MMC.

WHEREFORE, MMC demands judgment against the City for damages, to include, without limitation, consequential damages, prejudgment interest,

expenses, attorneys' fees, and court costs, and for such further relief as this Court deems just and appropriate.

## COUNT V: NEGLIGENCE
### (MMC v. the City)

163.   This is an action against the City for damages, based on negligence, arising under the general maritime law of the United States and the laws of the state of Florida.

164.   MMC re-alleges paragraphs 1 through 116 and incorporates them herein by reference.

165.   The City undertook to construct a breakwater, for the protection of the Marina, and to do so before MMC spent millions of dollars to build docks and piers that depended on that breakwater for protection.

166.   Having undertaken to construct a breakwater for the protection of the Marina, the City had a duty to exercise reasonable care under the circumstances.

167.   The City had knowledge that MMC relied upon the City's construction of the breakwater and had knowledge that the failure to construct a properly designed breakwater would result in harm to MMC.

168.   Failure by the City to construct a properly designed breakwater to protect the Marina constitutes negligence.

169.   The City breached its duty to exercise reasonable care under the circumstances, as set forth above.

170.   The City's negligence was a substantial factor in the damages caused to the Marina and to MMC.

WHEREFORE, MMC demands judgment against the vessel owners for damages, to include, without limitation, consequential damages, prejudgment interest, expenses, attorneys' fees, and court costs, and for such further relief as this Court deems just and appropriate.

/s/Matthew A. Bush
EDWARD P. FLEMING
Florida Bar No.  615927
MATTHEW A. BUSH
Florida Bar No. 58312
MCDONALD • FLEMING
719 S. Palafox St.
Pensacola, Florida  32502
flemingservice@pensacolalaw.com
mabush@pensacolalaw.com
(850) 202-8531